O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PATRICK MOONEY,                    )  Case No. EDCV 11-1251-JPR
                                   )
                  Plaintiff,       )
                                   )
          vs.                      )  MEMORANDUM OPINION AND ORDER
                                   )  AFFIRMING THE COMMISSIONER
COMMISSIONER OF SOCIAL             )
SECURITY ADMINISTRATION,           )
                                   )
                  Defendant.       )
                                   )
_____    )

I.    PROCEEDINGS

      Plaintiff seeks review of the Commissioner's final decision
denying his application for Supplemental Security Income ("SSI").
The parties consented to the jurisdiction of the undersigned U.S.
Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is
before the Court on the parties' Joint Stipulation, filed May 4,
2012.  The Court has taken the Joint Stipulation under submission
without oral argument.  For the reasons stated below, the
Commissioner's decision is affirmed and this action is dismissed.

II.   BACKGROUND

      Plaintiff was born on January 31, 1957.  (Administrative
Record ("AR") 166.)  He has a ninth-grade education.  (AR 42.)
He claims to have been disabled because of several impairments,

1

including a back condition, hepatitis C, liver disease, and type II diabetes. (AR 148.) Plaintiff originally claimed that his disability started in August 2003, but he later changed the onset date to January 2009. (AR 77, 148.)

On August 19, 2008, Plaintiff filed an application for SSI.[1] (AR 144.) After Plaintiff's application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 11, 2009. (AR 40-82.) Plaintiff, who was represented by counsel, testified at the hearing, as did medical expert Dr. Samuel Landau and vocational expert ("VE") Corinne Porter. (Id.) On January 19, 2010, the ALJ denied Plaintiff's claim, determining that he had the severe impairments of "liver cirrhosis[,] chronic active hepatitis caused by hepatitis C[,] degenerative disc disease of lumbar spine, obesity, and type II diabetes" (AR 28) but retained the residual functional capacity ("RFC")[2] to perform "less than a full range of light work," with several specified limitations (AR 29).

On March 31, 2010, after retaining a new attorney, Plaintiff requested review by the Appeals Council. (AR 13-16.) On June 1, 2011, Plaintiff submitted a brief and additional evidence to the Council. (AR 187-92, 420-78.) On July 8, 2011, the Council considered the additional evidence but denied Plaintiff's request

---

[1]   The AR does not contain Plaintiff's SSI application, but his disability report and several other documents reflect that it was filed on August 19, 2008. (See, e.g., AR 28, 83-86, 144.)

[2]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. 20 C.F.R. § 416.945(a); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

for review.  (AR 1-6.)  The Council ordered that the additional

evidence be made part of the administrative record.[3]  (AR 6.)

This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review

the Commissioner's decision to deny benefits.  The Commissioner's

findings and decision should be upheld if they are free of legal

error and are supported by substantial evidence based on the

record as a whole.  § 405(g); Richardson v. Perales, 402 U.S.

389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

means such evidence as a reasonable person might accept as

adequate to support a conclusion.  Richardson, 402 U.S. at 401;

Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

is more than a scintilla but less than a preponderance.

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

---

[3]   The Council ordered that the records designated as
"Exhibit 17F" before the agency be made part of the
administrative record.  (AR 6.)  Exhibit 17F included treatment
notes from the California Department of Corrections ("CDC")
dating from 2006 to 2008 and a March 2010 prescription and two
June 2010 assessments from Dr. Minho Yu at the Riverside County
Regional Medical Center ("RCRMC").  (AR 420-78.)  In its order,
the Council described Exhibit 17F as "[t]reatment notes from the
[CDC] for the period July 2006 through January 2008" and did not
mention the records from Dr. Yu.  (AR 6.)  But the Council
specifically considered Dr. Yu's records when denying review, and
those records were included in the AR filed with the Court.  (AR
2, 472-78.)  Thus, the full Exhibit 17F was apparently made a
part of the administrative record.  In any event, under Taylor v.
Comm'r of Soc. Sec. Admin., the Court considers Dr. Yu's records
when reviewing the ALJ's decision because they were submitted to
and considered by the Council when it denied review.  659 F.3d
1228, 1232 (9th Cir. 2011).

Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).   "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

## IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a severe physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.   § 416.920(a)(4)(i).   If the claimant is not engaged in substantial gainful activity, the second step requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting

4

his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. § 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the ALJ to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the ALJ to determine whether the claimant has sufficient RFC to perform his past work; if so, the claimant is not disabled and the claim is denied. § 416.920(a)(4)(iv).  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the ALJ then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work in the national economy. § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.   The ALJ's Application of the Five-Step Process**

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since August 19, 2008, the date of his SSI application.  (AR 28.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of "liver cirrhosis[,]

chronic active hepatitis caused by hepatitis C[,] degenerative disc disease of lumbar spine, obesity, and type II diabetes." (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled any of the impairments in the Listing.  (AR 29.)  At step four, the ALJ found that Plaintiff had the RFC to perform "less than a full range of light work," with the following limitations:

> [Plaintiff] can stand and or walk for 4 hours in an 8-hour workday for 30 minutes at a time; he can sit for eight hours in an 8-hour workday but needs to stand and stretch for a few seconds every 30 minutes; he requires regular 15 minute breaks every 2 hours; he can lift and/or carry 10 pounds frequently and 20 pounds occasionally; he can occasionally stoop or bend; he can not climb stairs, ladders, work at heights or balance; he can not do work requiring hypervigilance; he must work in an air conditioned environment; he can not operate motorized equipment or work around unprotected machinery; he can not do extremes of twisting with the upper torso; he may need to use a cane to walk but not to stand; and he may miss work once or twice a month.

(AR 29.)  At step five, the ALJ found that Plaintiff had no past relevant work but had the RFC to perform the jobs of "garment sorter" and "electronics worker."  (AR 32-33.)  The ALJ therefore concluded that Plaintiff had not been under a disability since August 19, 2008, the date his application was filed.  (AR 33-34.)

**V.  RELEVANT FACTS**

In August 2007, a California Department of Corrections

("CDC") initial health screening record noted that Plaintiff suffered from hypertension, diabetes mellitus, and mid-lower back pain; it also indicated that he used a cane and a walker.  (AR 198.)   That same month, a liver biopsy showed "[c]hronic hepatitis, with moderate inflammatory activity (grade 3) and septal fibrosis to cirrhosis (stage 3-4)," and a gallbladder biopsy showed chronic cholecystitis and cholelithiasis.  (AR 202.)   In June 2008, a CDC record noted that Plaintiff had "persistent pain in the thoracic region," and a CT scan showed spinal stenosis and degenerative joint disease.  (AR 204.)

In August 2008, Plaintiff was hospitalized at the Riverside County Regional Medical Center ("RCRMC") for complaints of vomiting blood and right-upper-quadrant pain.  (AR 227, 229, 232, 234, 236-41, 293, 297-99.)   A right-upper-quadrant abdominal sonogram revealed fatty infiltrate of the liver and an unremarkable pancreas (AR 322, 326), and an esophagogastroduodenoscopy revealed trace esophageal varices[4] (AR 241-43, 301-02).   That same month, an MRI of Plaintiff's left wrist revealed cellulitis.  (AR 255-56, 318-19.)

In September 2008, Plaintiff complained of chronic low-back pain from an "old disc problem," and the RCRMC doctor noted that Plaintiff had had an L-spine fusion in 2003.  (AR 225-26, 284-85.)   An x-ray revealed "[l]evoscoliosis with [p]ostsurgical

---

[4]   "Bleeding esophageal varices are very swollen veins in the walls of the lower part of the esophagus (the tube that connects your throat to your stomach) that begin to bleed." MedlinePlus, U.S. Nat'l Library of Med., Nat'l Inst. of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000268.htm (last visited May 30, 2012).   Scarring (or cirrhosis) of the liver is the most common cause of esophageal varices.   Id.

changes" and "[d]egenerative disk disease as with lumbar spondylosis."[5]  (AR 320.)  In October, Plaintiff complained of right-upper-quadrant abdominal pain; he was noted to have liver disease. (AR 221-24.)

On October 22, 2008, Bunsri T. Sophon, M.D., a board-certified orthopaedic surgeon, examined Plaintiff at the Social Security Administration's ("SSA") request.  (AR 259-64.) Plaintiff complained of low-back pain and reported a fall injury and lumbar spinal-fusion surgery in 2003.  (AR 259.)  Dr. Sophon noted that Plaintiff "brought in a cane for ambulation but demonstrated a normal gait without using the cane."  (AR 260.) Dr. Sophon noted that Plaintiff "demonstrate[d] non-painful restriction of motion of the lumbosacral spine, and a normal neurological examination"; he diagnosed lumbar disc disease, "status post lumbar spinal fusion."  (AR 263.)  Dr. Sophon opined that Plaintiff was "capable of lifting and carrying 50 pounds occasionally, 20 pounds frequently" and was "restricted to sitting, standing and walking 6 hours out of an 8-hour workday." (Id.)

Later in October 2008, Plaintiff was seen at the RCRMC for

---

[5]  The radiology report also included the following findings:

Post laminectomy changes are seen at L2 through L5 with pedicle screws in place. A stimulation device is seen with leads noted posteriorly. Compression deformity of T11 is noted.  Degenerative disk disease is seen at the T10-11 through the T12-L1 disk levels.  The remaining vertebral heights are maintained.  Levoscoliosis is noted.  Exuberant osteophytic formation is identified.

(AR 320.)

complaints of upper abdominal pain.  (AR 280-81.)  He was noted
to have "chostochondritis[6] vs pancreatitis," hypertension,
hepatitis C with history of esophageal varices and liver
cirrhosis, psoriatic rash, type II diabetes mellitus, and a
history of chronic back pain.  (AR 219-20, 280-81.)

On November 3, 2008, Dr. R. Jacobs completed a physical
residual capacity assessment of Plaintiff at the SSA's request.
(AR 266-70.)  Dr. Jacobs's diagnoses included "L/S disc disease,"
"S/P spinal lumbar fusion," and hepatitis C.  (AR 266.)  Dr.
Jacobs opined that Plaintiff could lift 50 pounds occasionally
and 25 pounds frequently, stand and/or walk about six hours in an
eight-hour workday, sit for a total of about six hours in an
eight-hour workday, and perform unlimited pushing and pulling.
(AR 267.)  Plaintiff could never climb ladders, ropes, or
scaffolds; he could only occasionally climb ramps and stairs; and
he was limited to "frequent" reaching in all directions.  (AR
268.)  Plaintiff was unlimited in his ability to balance, stoop,
kneel, crouch, crawl, and perform gross or fine manipulation.
(Id.)  Dr. Jacobs also found that Plaintiff should avoid
concentrated exposure to extreme cold or heat, vibration, and
hazards.  (AR 269.)

Later in November 2008, Dr. Yu at RCRMC saw Plaintiff for
complaints of upper abdominal pain.  (AR 277-78.)  Dr. Yu noted

---

[6]  "Costochondritis is an inflammation of a rib or the
cartilage connecting a rib."  MedlinePlus, U.S. Nat'l Library of
Med., Nat'l Inst. of Health, http://www.nlm.nih.gov/medlineplus/
ency/article/000164.htm (last visited May 30, 2012).  It is a
common cause of chest pain and usually goes away in a few days or
weeks.  Id.

that Plaintiff was suffering from "likely chostochondritis but need to rule out pancreatitis," hepatitis C with liver cirrhosis, "hypertension (improved)," and diabetes mellitus "(not on any medication)." (AR 277.) In December, an RCRMC note reflected that Plaintiff suffered from lower-back pain, hepatitis C, diabetes "at goal," and hypertension "at goal." (AR 353.)

In January 2009, Dr. D. Rose completed a physical RFC assessment at the SSA's request. (AR 329-33.) Dr. Rose's diagnoses included hepatitis C virus, "status post lumbar fusion" in 2003, diabetes, and hypertension. (AR 329.) Dr. Rose concluded that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and/or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and unlimited pushing and pulling. (AR 330.) Plaintiff could never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (AR 331.) He had no manipulative limitations and could reach in all directions. (Id.) He had to avoid all exposure to hazards, such as machinery and heights, but his exposure to other environmental hazards, such as cold, heat, and vibration, was not limited. (AR 332.) Dr. Rose noted that Dr. Sophon had found that Plaintiff had the RFC to perform "medium" work but "did not accommodate the lumbar fusion" and "did not address [Plaintiff's] liver impairment at all." (AR 333.)

In April 2009, Plaintiff went to the RCRMC emergency department complaining of back pain and seeking a medication refill. (AR 356.) He was noted to have chronic low-back pain

but normal motor strength, intact senses, and negative straight-leg raising.  (AR 357.)  In June 2009, an RCRMC note indicated that Plaintiff reported weakness of his lower extremity and used a cane with ambulation, he suffered from chronic low-back pain, his diabetes was at goal, his hepatitis was stable, and his hypertension was controlled.  (AR 349-50.)

In August 2009, Plaintiff was seen at RCRMC for complaints of back and left-foot pain and was eventually hospitalized for two days for treatment of cellulitis.  (AR 342, 362, 365-66, 373-76, 390.)  His discharge diagnoses included cellulitis of the left foot, hyperkalemia, hepatitis C, acute renal insufficiency, diabetes mellitus type II, and hypertension.  (AR 362.)  A Morse Fall Scale performed around that time was zero.[7]  (AR 344, 372.) In September and October, Dr. Yu noted that Plaintiff had chronic lower-back pain, controlled hypertension, hepatitis C and cirrhosis, and diabetes.  (AR 408-09, 415.)  Dr. Yu referred Plaintiff to the "Spine Clinic" for treatment of his back pain. (Id.)  In the October note, Dr. Yu remarked that Plaintiff was ambulating with a cane.  (AR 408.)  In November, an RCRMC note reflected that Plaintiff walked with a cane and had chronic low-back pain, hypertension controlled with medication, hepatitis C

---

[7]   The Morse Fall Scale is used to assess how likely it is a person will fall and considers factors such as history of falling, diagnosis, use of ambulatory aide or intravenous line, quality of gait, and mental status.  VHA NCPS Fall Prevention and Management, Morse Fall Scale, Dep't of Veterans Affairs, Nat'l Ctr. for Patient Safety, available at http://www.patientsafety. gov/CogAids/FallPrevention/ (follow "Morse Fall Scale" hyperlink).  A score of 0-24 indicates no risk of falling, a score of 25-50 indicates a low risk, and a score of 51 or higher indicates a high risk.  Id.

with cirrhosis, and diabetes mellitus controlled with medication. (AR 402-03.)

At the December 11, 2009 hearing before the ALJ, Plaintiff testified that he could not work because of pain in his back and stomach.  (AR 45.)  He said he could stand for three to five minutes without using a cane,[8] sit for 30 minutes without changing position, lift about five to 10 pounds, and "stumble" about 10 feet without his cane.  (AR 60-61.)  He occasionally used a wheelchair and walker.  (AR 58.)  Plaintiff said it would take 30 minutes for him to climb a flight of stairs, and he usually spent four to six hours a day lying down.  (Id.) Plaintiff testified that he last worked in 1995 or 1996, and he was incarcerated from 1996 to 1998, 2002 to 2004, and 2006 to 2008, for convictions of possession of drugs for sale, possession of methamphetamine for sale, and manufacturing methamphetamine. (AR 42-44.)

Dr. Landau, the medical expert, testified that Plaintiff "has liver cirrhosis and chronic hepatitis, caused by the hepatitis C virus," degenerative disc disease of the lumbar spine, obesity, type II diabetes mellitus with retinopathy, and "psychiatric diagnoses."  (AR 46-47.)  Dr. Landau stated that Plaintiff's liver disease was classified as "A," which is considered mild and resulted in a life expectancy of 10 to 20 years.  (AR 46, 51-52.)  Dr. Landau opined that Plaintiff was limited to "standing and walking four hours out of a day" but had

---

[8]  He earlier testified that he could stand for "10, 12, 15 minutes," but he did not specify whether he meant without a cane. (AR 45.)

"no limitation to sitting with normal breaks every two hours" and
was "mobile without a cane." (AR 47.) Dr. Landau continued:

> Lifting and carrying would be 10 pounds frequently, 20
> pounds occasionally. Can occasionally stoop and bend.
> He can climb stairs, but he can't climb ladders, work at
> heights, or balance . . . . His work environment should
> be air-conditioned. He cannot operate motorized
> equipment or work around unprotected machinery.

(AR 47-48.) Dr. Landau listed the evidence he relied upon in
making those findings. (AR 48-50.)

**VI.   DISCUSSION**

Plaintiff raises four disputed issues: (1) whether the
Appeals Council properly considered the evidence he submitted
after the ALJ's decision (J. Stip. 3-6, 9-10), (2) whether the
ALJ properly discounted his credibility (id. at 10-13, 16-17),
(3) whether the ALJ's finding that Plaintiff needed a cane to
walk but not to stand and his resulting RFC assessment were
supported by substantial evidence (id. at 18-20, 25-26), and (4)
whether the ALJ appropriately accounted for the math and language
skills required by the jobs Plaintiff was found capable of
performing (id. at 26-27, 30-31).

**A.   New Evidence**

**1.   Applicable law**

When "new and material evidence is submitted" to the Appeals
Council relating "to the period on or before the date of the
[ALJ's] hearing decision," the Council must consider the
additional evidence in determining whether to grant review. See
20 C.F.R. § 416.1470(b). When the evidence postdates the ALJ's

13

decision, the Council must still consider it if it is "related to" the period before the ALJ decision.  <u>Taylor</u>, 659 F.3d at 1233 (treating physician's opinion "concerned his assessment of [claimant's] mental health since his alleged disability onset date" and therefore "related to" period before claimant's disability insurance coverage expired and before ALJ's decision (citing 20 C.F.R. § 404.970(b))).

The Appeals Council is not required to make any particular evidentiary finding when rejecting evidence submitted after an adverse administrative decision.  <u>Gomez v. Chater</u>, 74 F.3d 967, 972 (9th Cir. 1996); <u>see also</u> <u>Taylor</u>, 659 F.3d at 1232.  When the Council considers additional evidence but denies review, the additional evidence becomes part of the administrative record for purposes of this Court's analysis.  <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179-80 (9th Cir. 2000); <u>Taylor</u>, 659 F.3d at 1232.  This Court then engages in an "overall review" of the ALJ's decision, including the new evidence, to determine whether the decision was "supported by substantial evidence" and "free of legal error."[9] <u>Taylor</u>, 659 F.3d at 1232.

## 2.   Relevant facts

On January 19, 2010, the ALJ issued his decision denying

_____

[9]   Contrary to the Commissioner's arguments (J. Stip. at 7-8), this review comes under "sentence four" of 42 U.S.C. § 405(g), not "sentence six."  <u>See, e.g.</u>, <u>Boucher v. Astrue</u>, No. C09-1520-JCC, 2010 WL 2635078 (W.D. Wash. June 25, 2010). "Sentence six" review considers whether to compel the Commissioner to accept "additional evidence" not previously "incorporate[d] . . . into the record."  § 405(g).  Here, the additional evidence was submitted to the Appeals Council, which considered it and incorporated it into the administrative record. (<u>See</u> AR 1-6.)

Plaintiff's claim, and soon thereafter Plaintiff retained new counsel and requested review by the Appeals Council.  (AR 26-34, 13.)  On June 1, 2011, nearly 18 months after the ALJ's decision, Plaintiff submitted additional evidence to the Council.  (AR 187-92, 420-78.)  Specifically, Plaintiff submitted CDC records that included, among other things, a July 2006 physical-disability form stating that Plaintiff had a "mobility impairment" and listing "walker" under a section titled "health care appliance" (AR 421); a July 2007 record stating that Plaintiff "uses cane" (AR 462); a September 2007 record stating that Plaintiff "uses walker" and has a somewhat "slow and stiff" gait (AR 469); and a December 2007 record noting that Plaintiff "uses walker" (AR 468).

Plaintiff also submitted records from Dr. Yu that postdated the ALJ's January 19, 2010 decision.  Specifically, Plaintiff submitted a March 23, 2010 prescription for a four-wheeled walker (AR 472); a June 1, 2010 form titled "Need for Assistive Hand-Held Device for Ambulation" ("Ambulation Form") (AR 478); and a June 1, 2010 "Residual Functional Capacity Questionnaire-Spine" ("RFC Questionnaire") (AR 473-77).  In the Ambulation Form, Dr. Yu stated that Plaintiff needed to use a walker for all standing and walking.  (AR 478.)  In the RFC Questionnaire, Dr. Yu stated that Plaintiff suffered from type II diabetes, hypertension, and lower-back pain because of "T11 compression fracture with decrease of normal lumbar lordosis," but Dr. Yu listed "lower back pain" as the only "symptom" that resulted from those impairments.  (AR 473.)  Dr. Yu did not list any laboratory or test results that showed Plaintiff's impairments, as requested by

the form, but he did state that Plaintiff had reduced range of motion in his hip and shoulder, a positive straight-leg-raising test, abnormal gait, muscle spasm, muscle weakness, and tenderness.  (Id.)

Dr. Yu opined that Plaintiff could walk a half block without rest or pain, sit continuously for 30 minutes at a time, and stand for five to 10 minutes at a time.  (AR 474-75.)  Plaintiff needed to walk every 10 minutes in an eight-hour work day, and each period of walking needed to be four minutes long; shift at will from sitting, standing, or walking; and take unscheduled five-to-10-minute breaks every 30 minutes during an eight-hour workday.  (AR 475.)  Dr. Yu answered "yes" to the question, "While engaging in occasional standing/walking, must your patient use a cane or other assistive device?"  (AR 476.)  Dr. Yu stated that Plaintiff could "rarely" lift less than 10 pounds and never lift more than that; "rarely" twist or climb stairs; "occasionally" use his upper extremities for reaching, handling, and fingering; and "never" stoop, crouch, or climb ladders. (Id.)  Dr. Yu estimated that Plaintiff would miss more than four days of work a month because of his impairments.  (AR 477.)

On July 8, 2011, the Appeals Council denied review.  (AR 1-6.)  The Council discussed examining physician Dr. Sophon's findings, including his observation that Plaintiff demonstrated a normal gait without using a cane.  (AR 2.)  The Council concluded that Dr. Sophon's "specialization and his assessment, which was based observations [sic] and objective findings," "provide[d] substantial evidence to support the [ALJ's] decision and provide[d] a sufficient basis for not adopting the earlier

statements that [Plaintiff's] representative pulled from [Plaintiff's] records with the California State Prisons." (<u>Id.</u>) The Council also found that Dr. Yu's March 2010 prescription for a walker and June 2010 assessments were not supported by the "credible evidence of record" and "would not have changed the [ALJ's] analysis or assessment of [Plaintiff's] disability status." (<u>Id.</u>)  The Council noted that it had "considered the arguments and updated submissions by [Plaintiff's] representative." (<u>Id.</u>)

### 3.  Analysis

Plaintiff's prison medical records predated the ALJ's decision, and the Appeals Council was therefore required to consider them when deciding whether to grant review.  20 C.F.R. § 416.1470(b); <u>Taylor</u>, 659 F.3d at 1232.  The Council did discuss those records but observed that they would not have changed the ALJ's conclusion that Plaintiff was not disabled.  (AR 2.)

In his decision, the ALJ found that the medical evidence of record at that time showed that Plaintiff "ambulates with a cane," but "no medical evidence indicat[es] the [Plaintiff] is unable to stand without the use of a cane for any period of time":

> [T]he consultative examiner noted that [Plaintiff]
> actually demonstrated the ability to walk with a normal
> gait without an assistive device.  There is also evidence
> [Plaintiff] was hospitalized for a brief two day period
> because of cellulitis of the left foot.  The records
> indicate that at discharge there was discussion about the
> use of a wheelchair in the home.  These records, however,

17

1    fail to indicate [Plaintiff] is unable to stand without

2    a cane.  In fact, at the same time, [Plaintiff] recorded

3    a total Morse Fall Scale score of zero; indicating there

4    was no need to implement fall prevention protocol.

5   (AR 30 (internal citations and footnotes omitted).)  The ALJ also

6   noted that a Morse Fall Scale score of zero "show[ed] [Plaintiff]

7   did not use an ambulatory aid."  (AR 30 n.4.)  The ALJ then

8   incorporated Plaintiff's use of a cane when walking into the RFC,

9   finding that "he may need to use a cane to walk but not to

10  stand."  (AR 29.)

11       The prison medical records do not render the ALJ's finding

12  unsupported by substantial evidence.  Those records show only

13  that Plaintiff used or was issued an assistive device — a cane or

14  a walker — but they do not indicate that Plaintiff was unable to

15  stand without using those devices.[10]  (AR 421, 462, 468-69.)

16  Because the RFC accounts for Plaintiff's use of an assistive

17  device to walk, the prison medical records do not render the

18  ALJ's decision unsupported by substantial evidence.

19       Dr. Yu's prescription and assessments, meanwhile, postdate

20  the ALJ's decision, and nothing indicates that they relate to the

21  period before the ALJ's decision.  Dr. Yu did not attach any of

22  his treatment reports to his assessments, and he left blank the

23

24       [10]  Although Plaintiff points to the July 2006 physical-
25  disability form as proof that he was "prescribed a walker for
    ambulation" (J. Stip. 4), that form indicates only that Plaintiff
26  had a "mobility impairment — with or without assistive device"
    and notes that Plaintiff either used or was issued a walker (AR
27  421).  The form does not state that Plaintiff was prescribed a
    walker nor does it in any way indicate that Plaintiff required an
28  assistive device to walk or stand.

18

portion of the RFC questionnaire form that asks for a description of the doctor's "[n]ature, frequency and length of contact" with a patient.  (AR 473.)   The RCRMC records that were previously submitted to the SSA, however, showed that Dr. Yu treated Plaintiff on only a few occasions, usually for conditions that were unrelated to Plaintiff's back pain.  (AR 238-39, 255, 277-79.)   Indeed, it appears that Dr. Yu treated Plaintiff's back condition only in September and October 2009, when he noted that Plaintiff suffered from, among other things, "chronic low back pain" and referred him to the spine clinic.  (AR 408-09, 415-16.) Dr. Yu apparently did not prescribe a walker or other ambulatory device until March 23, 2010, which may indicate that Plaintiff's condition simply worsened after the ALJ's January 19, 2010 decision.  (AR 472.)   Under such circumstances, the Court cannot conclude that Dr. Yu's assessments related to the period before the ALJ's decision, and thus the Appeals Council was not required to consider them when deciding whether to grant review.  See 20 C.F.R. § 416.1470(b) ("[T]he Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."); compare Taylor, 659 F.3d at 1232 (treating doctor's assessment postdated expiration of disability insurance and ALJ decision but "encompassed the period from the date of disability onset . . . until the date of his evaluation," during which time doctor treated plaintiff twice, supervised nurse practitioner who treated plaintiff, and approved nurse practitioner's prescriptions).

Even assuming Dr. Yu's assessments pertained to Plaintiff's

physical state prior to the ALJ's decision, they did not render the ALJ's decision unsupported by substantial evidence.  As the Appeals Council observed, Dr. Sophon found that Plaintiff had a "normal gait" without using a cane, which directly conflicts with Dr. Yu's findings; moreover, all the other doctors found that Plaintiff retained a higher RFC than did Dr. Yu.  Because Dr. Yu's opinion is contradicted, it can be rejected for specific and legitimate reasons that are based on the substantial evidence of record.  See, e.g., Reddick, 157 F.3d at 725.  Such reasons exist here.

As the Appeals Council observed, the "credible evidence of record does not support" Dr. Yu's statements and assessments. (AR 2.)  Dr. Yu's findings conflicted with those of examining physician Dr. Sophon, consulting physicians Drs. Jacobs and Rose, and testifying physician Dr. Landau, all of whom rendered opinions prior to the ALJ's decision and found that Plaintiff retained a higher functional capacity than that stated by Dr. Yu. (AR 47-48, 259-64, 266-70, 329-33.)  And Dr. Yu's own treatment notes never indicated that Plaintiff was as limited as stated in his June 2010 assessments.  As discussed above, it appears that Dr. Yu treated Plaintiff for his back pain on only two occasions, and the treatment records from those visits do not reflect any limitations at all.  On the check-off RFC assessment form, Dr. Yu's only "objective findings" were limited ranges of motion of the hip and shoulder, positive straight-leg raising, abnormal gait, muscle spasm, muscle weakness, and tenderness; Dr. Yu provided no further explanation for his RFC findings, nor did he identify or attach any laboratory or test results, treatment

notes, or other records that would support his RFC assessment, as
the form specifically requested.  (AR 473.)  Dr. Yu's assessments
could therefore be rejected because they were inconsistent with
the substantial evidence of record and unsupported by his own
treatment notes.  See Connett v. Barnhart, 340 F.3d 871, 875 (9th
Cir. 2003) (treating doctor's opinion properly rejected when
treatment notes "provide no basis for the functional restrictions
he opined should be imposed on [claimant]"); Valentine v. Comm'r,
Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009)
(contradiction between treating physician's opinion and his
treatment notes constitutes specific and legitimate reason for
rejecting treating physician's opinion); Batson v. Comm'r of Soc.
Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may
discredit treating physicians' opinions that are conclusory,
brief, and unsupported by the record as a whole . . . or by
objective medical findings."); Rollins v. Massanari, 261 F.3d
853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating
physician's opinion when opinion was contradicted by or
inconsistent with the treatment reports).  Moreover, Dr. Yu's
assessments, unlike the other doctors', were rendered after the
ALJ issued his decision and are therefore less persuasive.  See
Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996).

Also, as the Appeals Council observed (AR 2), Dr. Sophon's
assessment of Plaintiff's back condition was entitled to greater
weight because he was a board-certified orthopaedic surgeon (AR
263).  Although Dr. Yu's area of specialization, if any, is
unknown, it appears that he did not specialize in orthopaedics
because he apparently worked in RCRMC's primary-care clinic and

1   referred Plaintiff to the "spine clinic" for follow-up on his

2   low-back pain.  (AR 415.)  Thus, Dr. Sophon's opinion was

3   entitled to greater weight than Dr. Yu's.  See 20 C.F.R.

4   § 416.927(c)(5) ("We generally give more weight to the opinion of

5   a specialist about medical issues related to his or her area of

6   specialty than to the opinion of a source who is not a

7   specialist."); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir.

8   1996) (same).

9        The Appeals Council also correctly noted that Dr. Sophon's

10   assessment was "based [on] observations and objective findings"

11   and therefore provided "substantial evidence to support the

12   [ALJ's] decision."  (AR 2.)  Dr. Sophon examined Plaintiff and

13   found, among other things, that Plaintiff had a normal gait

14   without using his cane; limited range of motion of the thoracic

15   and lumbar spine; normal pulses, sensation, and reflexes; and

16   negative straight-leg raising.  (AR 260-62.)  Because Dr.

17   Sophon's opinion regarding Plaintiff's limitations resulting from

18   his back condition was supported by independent clinical

19   findings, it constituted substantial evidence that supported the

20   ALJ's decision.[11]   See Tonapetyan v. Halter, 242 F.3d 1144, 1149

21   (9th Cir. 2001) (examining doctor's opinion constituted

22   substantial evidence supporting the ALJ's findings "because it

23   rests on his own independent examination of [plaintiff]");

24   Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where

25   the opinion of the claimant's treating physician is contradicted,

26

27        [11]   The ALJ took some issue with Dr. Sophon's RFC findings

28   but did not question Dr. Sophon's clinical assessments related to
    Plaintiff's back and lower extremities.  (AR 31, 32.)

and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.").

Accordingly, even considering the new evidence, substantial evidence supported the ALJ's determination that Plaintiff was not disabled. Remand is not warranted on this ground.[12]

### B. The ALJ's Credibility Determination

The ALJ gave specific reasons to support his finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with" the RFC determination. (AR 31.) Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's

---

[12] Plaintiff has not presented any reason why he did not proffer the prison medical records, which presumably were available at the time of the hearing, to the ALJ rather than waiting to submit them to the Appeals Council. Nor has he explained why he could not have obtained the assessments from Dr. Yu in a more timely manner. Reviewing administrative records supplemented with information the ALJ did not consider "mire[s]" the federal courts "in an Alice in Wonderland exercise of pretending that evidence the real ALJ didn't know existed was really before him." Angst v. Astrue, 351 F. App'x 227, 229-30 (9th Cir. 2009) (Rymer, J., concurring). It also encourages inertia by not penalizing those who, for no reason other than lack of preparation, do not present their best evidence to the ALJ. Taylor relies on Ramirez v. Shalala, 8 F.3d 1449, 1451-54 (9th Cir. 1993), for the proposition that review of such evidence in these circumstances is proper, see 659 F.3d at 1232, but in fact Ramirez did not decide the issue. See Angst, 351 F. App'x at 229 (Rymer, J., concurring); Mayes v. Massanari, 276 F.3d 453, 461 n.3 (9th Cir. 2001). Nonetheless, because Taylor holds that district courts must consider such evidence and review the "overall record," the Court does so here.

subjective symptoms.

Although the medical evidence established that Plaintiff had medically determinable physical impairments that were likely to cause him some pain, the existence of some pain does not constitute a disability if it does not prevent a plaintiff from working.  See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (SSI program is "intended to provide benefits to people who are unable to work; awarding benefits in cases of nondisabling pain would expand the class of recipients far beyond that contemplated by the statute."); Thorn v. Schweiker, 694 F.2d 170, 171 (8th Cir. 1982) ("A showing that [claimant] had a back ailment alone would not support a finding that she was disabled unless the limitations imposed by the back ailment prevented her from engaging in substantial gainful activity.").

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); Varney v. Sec'y of Health & Human Servs., 846 F.2d 581, 584 (9th Cir. 1988).  Absent affirmative evidence of malingering, the ALJ must give "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

24

Here, the ALJ made specific, convincing findings in support of his adverse credibility determination.  First, the ALJ observed that Plaintiff's "work history and apparent illegal activity reflects a lack of motivation to work in the open labor market."  (AR 30.)  Indeed, Plaintiff testified that he last worked in 1995 or 1996, which was at least 13 years before his alleged disability onset date of January 2009.  (AR 42, 77.)  Plaintiff's earnings record also showed that prior to 1996, he had not earned wages for approximately 10 years.[13]  (AR 142-43.)  Since 1996, Plaintiff has served three prison terms for drug offenses, including possession of methamphetamine for sale and manufacturing methamphetamine.  (AR 43-44.)  Plaintiff's poor work record was a valid reason for finding Plaintiff less credible.  See Thomas, 278 F.3d at 959 (credibility diminished when claimant "had an extremely poor work history and has shown little propensity to work in her lifetime" (internal quotation marks omitted)).

The ALJ also noted that if Plaintiff's limitations were as significant as he claimed, "one would expect some atrophy in the lower extremities due to disuse" (AR 31), but instead Plaintiff was found to have no evidence of muscle atrophy and grossly normal muscle strength in his lower extremities.  (AR 262.)  This was also a valid reason for discounting Plaintiff's credibility.  See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (credibility of claimant's claim of excruciating pain diminished

---

[13]  Plaintiff's earning record showed $2677.41 in regular wages in 1996 and $1430.14 in 1986.  (AR 143.)  His total lifetime earnings were $32,246.17.  (AR 142.)

1  when she "did not exhibit muscular atrophy or any other physical

2  signs of an inactive, totally incapacitated individual").[14]

3      The ALJ found that Plaintiff's alleged limitations were not

4  fully corroborated by the medical evidence. (AR 30.)  As the ALJ

5  observed, no treating source had delineated any functional

6  limitations arising from Plaintiff's liver cirrhosis, hepatitis

7  C, or type II diabetes mellitus. (AR 31.)  Indeed, RCRMC notes

8  state that Plaintiff's hepatitis was "stable" (AR 349) and his

9  diabetes was "at goal" or "controlled" with medication (AR 349-

10  50, 353, 403).  And as the ALJ observed, at least prior to the

11  date of his decision, no treating source ever found that

12  Plaintiff's back impairment resulted in functional limitations.[15]

13

14      [14]  Plaintiff relies on an out-of-circuit case for the
15  proposition that "lack of atrophy" is "not enough" to support an
    adverse credibility determination.  (J. Stip. 17.)  In that case,
16  the ALJ discounted a claimant's allegations of pain because
    "doctors ha[d] not observed either muscle wasting, muscle atrophy
17  or decreased muscle strength." Miller v. Sullivan, 953 F.2d 417,
    422 (8th Cir. 1992).  The Eighth Circuit found, however, that the
18  ALJ "cannot discount [the claimant's] claim simply because she
    d[id] not show an effect that other people suffering from
19  disabling pain may show." Id. at 422-23.  But in Meanel, which
    postdates Miller, the Ninth Circuit upheld an ALJ's reliance on
20  lack of atrophy to discredit a claimant's allegations of
    disabling pain. 172 F.3d at 1114.  In any event, even if the
21  ALJ's reliance on that factor was in error, it was harmless in
    light of his other reasons for discounting Plaintiff's
22  credibility.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d
23  1155, 1162 (9th Cir. 2008) (if substantial evidence supports
    ALJ's credibility determination and error "does not negate the
24  validity" of it, error is harmless and does not warrant
    reversal).
25

26      [15]  Although Dr. Yu's June 2010 RFC Questionnaire states
    that Plaintiff is extensively limited by his "lower back pain,"
27  as discussed in Section A, no evidence exists that Plaintiff had
    those limitations when the ALJ issued his decision, and in any
28  event, Dr. Yu's findings conflict with the substantial evidence

(AR 31.)   The ALJ noted that Plaintiff had had spinal surgery and suffered from degenerative disc disease of the lumbar spine, but he nevertheless had "a mostly normal physical examination."   (AR 31.)   Specifically, Plaintiff demonstrated "non-painful restriction of motion of the lumbosacral spine, and a normal neurological evaluation"; no tenderness or muscle spasm of the lumbar spine; negative straight-leg raising; normal ranges of motion of the upper and lower extremities; normal pulses; grossly normal motor strength; normal sensation of the upper and lower extremities; and normal reflexes.   (AR 259-63.)   Plaintiff "brought in a cane for ambulation but demonstrated a normal gait without using the cane," could not walk on his toes, and performed a "25 percent squatting maneuver."   (AR 260.)   And in August 2009, Plaintiff had a Morse Fall score of zero, indicating no risk of falling.   (AR 344, 372.)   The ALJ was entitled to rely on a lack of corroborating medical evidence when assessing Plaintiff's credibility.   <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); <u>see also</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

     Plaintiff argues that the ALJ committed reversible error when he "failed to consider" the field office's observations of

---

of record at the time of the ALJ's decision.

Plaintiff.  (J. Stip. 13.)  But the field office's brief notation that Plaintiff "came in waking [sic] with a cane, had trouble walking" (AR 145) is fully consistent with the evidence that the ALJ discussed and his RFC finding that Plaintiff "may need a cane to walk but not to stand" (AR 29).  The ALJ discredited Plaintiff's subjective complaints only "to the extent they [were] inconsistent with the [RFC] assessment."  (AR 31.)  Because the field office's observations were merely cumulative of the credited evidence and did not conflict with the ALJ's credibility finding, the ALJ was not required to discuss them.  See Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (ALJ need not discuss all evidence but must explain only why "significant," "probative" evidence has been rejected); Mondragon v. Astrue, 364 F. App'x 346, 349 (9th Cir. 2010) (ALJ not required to discuss doctors' specific statements "when their substance was adequately represented by the evidence the ALJ did discuss.").

Thus, the ALJ's credibility findings were supported by substantial evidence and were free of legal error.  Plaintiff is not entitled to remand on this ground.

## C.   The ALJ's RFC Assessment

Plaintiff argues that the ALJ's finding that Plaintiff required a cane for walking but not standing was unsupported by substantial evidence and thus that the RFC determination was erroneous.  (J. Stip. 18-20.)  Plaintiff also contends that the ALJ "reach[ed] his conclusion that [Plaintiff] is not disabled first and then concoct[ed] a [RFC] that is consistent with his conclusion."  (Id. at 18.)  Plaintiff bases his argument on the fact that the ALJ "posed a hypothetical that did not result in

28

jobs" and then "changed the hypothetical to not include a cane," which resulted in jobs. (<u>Id.</u>)

### 1. Applicable law

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c).   The Commissioner may satisfy that burden either through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2. <u>Tackett</u>, 180 F.3d at 1100-01.

### 2. Relevant facts

At the hearing, the ALJ asked the VE if she could identify jobs that could be performed by a person whose limitations included, among other things, that he "has to be able to use the cane while he's on his feet as needed." (AR 71-72.)   The VE responded,

> No, I can't, and that would be because of the need to use a cane while standing, and standing is only half a day. The types of work that would be available with this hypothetical would be jobs that would require bimanual dexterity, such as garment sorter, assembly, packaging electronics.   They would all require bimanual dexterity.

(AR 72.)   The ALJ then questioned Plaintiff's counsel:

> Q: . . . Counsel, tell me, in the record, is there indications of the use of a cane?

ATTY: I didn't see that he was, I didn't see any doctor
say in the record that the use of the cane was mandated,
just that he uses it.

ALJ: Okay. No indication for a prescription in the
record.  But, there was an observation that he used the
cane?

ATTY: I think that was at the consultative exam.

ALJ: I thought, oh, I see.  But, the doctor there
concluded there that there's no need for the use of a
cane?

ATTY: Right.

(AR 73.)  Later, the ALJ again questioned the VE:

Q: You said if there was no requirement to use a cane,
there would be some unskilled jobs in the light range?

A: Yes, there would be light, unskilled work.  Examples
would be garment sorter, . . . . [A]nd then, electronics
worker . . . .   And, there would be others.

(AR 78.)  The VE clarified that those jobs could be performed if
the individual needed a cane to walk but could not be performed
if he needed a cane to stand up.  (AR 78-81.)

### 3. Analysis

As discussed in Section A.3 above, the ALJ fully explained
his finding that Plaintiff required a cane to walk but not to
stand.  Specifically, the ALJ correctly noted that there was "no
medical evidence indicating the [Plaintiff] is unable to stand
without the use of a cane for any period of time," even though
Plaintiff at least sometimes apparently used a cane to walk.  (AR
30.)  Indeed, at the hearing, Plaintiff's counsel confirmed that

30

he "didn't see any doctor say in the record that the use of a cane was mandated, just that he uses it." (AR 73.)   In fact, one doctor found that Plaintiff was able to walk normally without the use of a cane (AR 260), and no doctor opined that Plaintiff required the use of an assistive device to stand or walk until June 2010, nearly five months after the ALJ's decision (AR 478).

The evidence Plaintiff cites is not inconsistent with the ALJ's finding that Plaintiff needed a cane to walk but not to stand.   Rather, those records indicate only that Plaintiff had various physical symptoms and used a cane for ambulation, which are limitations that the ALJ appropriately integrated into the RFC determination.   (See AR 350 (weakness of lower extremity, uses cane with ambulation), 357 (chronic low-back pain with normal motor strength, sensory intact, negative straight-leg raising), 374 (pain, edema, decreased sensation of left lower extremity),[16] 402 (walks with cane), 408 (ambulating with cane).)

Plaintiff's argument that the ALJ first concluded that Plaintiff was not disabled and then "concoct[ed]" an RFC to support that finding is unpersuasive.   In support of his claim, Plaintiff cites Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984), but in that case the Ninth Circuit found that an ALJ could not "reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result."   As discussed above, evidence suggesting an

---

[16]   This record was created while Plaintiff was hospitalized for treatment of cellulitis of the left foot, which presumably accounted for at least some of the symptoms of his left lower extremity.   (See AR 362.)

opposite result does not exist here.  Neither does the ALJ's
clarification of the hypothetical at the hearing indicate that he
was manipulating the record to support a finding that Plaintiff
was not disabled.  The ALJ first included a hypothetical
limitation that Plaintiff used a cane "while he's on his feet as
needed"; then, based in part on Plaintiff's own attorney's
representation that no doctor had opined that Plaintiff required
a cane, the ALJ asked the VE to list jobs that Plaintiff could
perform if using a cane was not required.  (AR 72-73, 78.)  In
response, the VE provided two jobs that could be performed if
Plaintiff did not need a cane to stand up.  (AR 78-81.)  As
previously discussed, in his decision the ALJ fully discussed his
finding that Plaintiff required a cane to walk but not stand.
(AR 30-31.)  Thus, the ALJ engaged in no wrongdoing here.

Plaintiff is not entitled to remand on this ground.

**D.   The Vocational Evidence**

Plaintiff argues that "the VE and ALJ failed to account for
the reasoning, math and language skills required" when finding
that Plaintiff could perform the positions of garment sorter and
electronics worker.  (J. Stip. 26-27.)  Plaintiff contends that
those requirements exceed his intellectual abilities.

**1.   Relevant facts**

After Plaintiff testified that he had a ninth-grade
education, the ALJ specifically questioned Plaintiff about his
language and math skills:

Q:  Did you learn how to read and write okay?

A:  Not very well.

Q:  Just short, simple, English words?

1       A:  Simple, you know.

2       Q:  And you can do adding and subtracting okay?

3       A:  Yeah, a little bit.

4  (AR 42-43.)  When the ALJ later asked Plaintiff if he could read

5  the newspaper, Plaintiff said he could read "[s]mall words" but

6  "can't sound things out" and has "a real rough time," which was

7  why he quit high school.  (AR 59.)

8       Later, in his hypothetical to the VE, the ALJ posed the

9  following limitations with regard to language and math skills:

10          [L]et's suppose someone has a ninth grade education.

11          They're not illiterate, but have very limited abilities

12          to read and write and do simple math.   Reading and

13          writing would be limited to short, simple words.

14  (AR 71.)   In response, the VE testified that Plaintiff could

15  perform the jobs of garment sorter, which carries the Dictionary

16  of Occupational Titles ("DOT") number of 222.687-014, and

17  electronics worker, which carries the DOT number of 726.687-010.

18  (AR 78.)

19       In his decision, the ALJ found that Plaintiff had the RFC to

20  perform less than a full range of light work with certain

21  specified limitations.  (AR 29.)  The ALJ also found that

22  Plaintiff had a "limited education" and was able to communicate

23  in English.  (AR 29, 32.)  The ALJ then concluded that

24  "[c]onsidering the [Plaintiff's] age, education, work experience,

25  and [RFC], there are jobs that exist in significant numbers in

26  the national economy that [he] can perform."  (AR 33.)  In so

27  finding, the ALJ specifically relied on the VE's testimony that

28  Plaintiff could perform the positions of garment sorter and

electronics worker.  (<u>Id.</u>)

   **2.  Analysis**

   All jobs listed in the DOT have general education development ("GED") levels, which address "aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  <u>See</u> DOT, app. C — Components of the Definition Trailer, 1991 WL 688702.  There are GED levels for language and mathematical development, which are indicated on a scale of one to six, with six being the most advanced.  <u>Id.</u> According to the DOT, the garment-sorter job requires level-two mathematical development, whereas the electronics-worker job requires level-two language development.[17]  DOT 222.687-014, 1991 WL 672131; DOT 726.687-010, 1991 WL 679633.  Plaintiff argues that those GED levels are inconsistent with the ALJ's hypothetical limitations to "simple math" and "short, simple words."  (J. Stip. 26-27.)

   Contrary to Plaintiff's argument, no evidence exists that the ALJ's reference to "simple math" indicated that Plaintiff did not meet the level-two mathematical development required to perform the job of garment sorter.  The DOT defines level-two mathematical development as the ability to

   [a]dd, subtract, multiply, and divide all units of
   measure.  Perform the four operations with like common
   and decimal fractions.  Compute ratio, rate, and percent.

_____

   [17]  The garment-sorter job requires level-one language development and the electronics-worker job requires level-one mathematical development.  DOT 222.687-014, 1991 WL 672131; DOT 726.687-010, 1991 WL 679633.

1    Draw and interpret bar graphs.  Perform arithmetic

2    operations involving all American monetary units.[18]

3 DOT, app. C — Components of the Definition Trailer, 1991 WL

4 688702.  The DOT also indicates that the "numerical aptitude"

5 required for the garment-sorter job is "Level 5 - Bottom 10% of

6 the Population," which is a "Markedly Low Aptitude Ability."  DOT

7 222.687-014, 1991 WL 672131.[19]  The only evidence that Plaintiff

8 may have had limited math abilities was his own testimony that he

9 had a ninth-grade education, could add and subtract "okay," and

10 did not do well in school.  (AR 42-43, 59.)  Plaintiff never

11 claimed that he was unable to add or subtract or that he was

12 limited in his ability to perform other mathematical tasks, such

13 as multiplying and dividing.  (AR 43.)  Thus, nothing in the

14 record indicates that Plaintiff did not meet the criteria for

15

16    [18]  Level-three mathematical development, by contrast,

17 requires the ability to

18    [c]ompute discount, interest, profit, and loss;
      commission, markup, and selling price; ratio and

19    proportion; and percentage.  Calculate surfaces, volumes,
      weights, and measures.

20

21    Algebra: Calculate variables and formulas; monomials and
      polynomials; ratio and proportional variables; and square

22    roots and radicals.

23    Geometry:  Calculate plane and solid figures,
      circumference, area, and volume.  Understand kinds of

24    angles and properties of pairs of angles.

25

26 DOT, app. C — Components of the Definition Trailer, 1991 WL
   688702.

27    [19]  Plaintiff incorrectly claims that the aptitude ability

28 percentages "are not found in the DOT books."  (J. Stip. 30.)
   See DOT 222.687-014, 1991 WL 672131.

level-two math development.

Moreover, the ALJ appropriately accounted for the fact that Plaintiff stopped attending school after the ninth grade by finding that he had a "limited education." (AR 32); <u>see</u> 20 C.F.R. 416.964(b)(3) ("We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."). "Limited education" indicates "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." <u>Id.</u> Such a finding therefore indicates that Plaintiff was in fact capable of performing the unskilled job of garment sorter. <u>See</u> DOT 222.687-014, 1991 WL 672131 (garment worker requires specific vocational preparation ("SVP") of 2); SSR 00-4p, 2000 WL 1898704, at *3 ("unskilled work corresponds to an SVP of 1-2" in DOT).

On the other hand, the ALJ's limitation to "short, simple words" may have been inconsistent with the level-two language development required by the electronics-worker job. The DOT defines level-two language development as requiring the following:

> READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
> WRITING: Write compound and complex sentences, using

36

> cursive style, proper end punctuation, and employing
> adjectives and adverbs.
>
> SPEAKING: Speak clearly and distinctly with appropriate
> pauses and emphasis, correct punctuation, variations in
> word order, using present, perfect, and future tenses.

DOT, app. C — Components of the Definition Trailer, 1991 WL 688702. Level-one language development, by contrast, requires substantially fewer skills:

> READING: Recognize the meaning of 2,500 (two- or three-
> syllable) words.   Read at rate of 95-120 words per
> minute.   Compare similarities and differences between
> words and between series of numbers.
>
> WRITING: Print simple sentences containing subject, verb,
> and object, and series of numbers, names, and addresses.
>
> SPEAKING: Speak simple sentences, using normal word
> order, and present and past tenses.

Id. Plaintiff's testimony that he could read only "short, simple words," which the ALJ apparently relied upon in formulating his hypothetical, appears to be more consistent with level-one language development than level two.

Any error in the ALJ's finding that Plaintiff could perform the electronics-worker job was harmless, however, because the finding that Plaintiff could perform the garment-sorter position was supported by substantial evidence and free of legal error. See Carmickle, 533 F.3d at 1162 (harmless-error rule applies to review of administrative decisions regarding disability); see also Gallo v. Comm'r of Soc. Sec. Admin., 449 F. App'x 648, 650 (9th Cir. 2011) ("Because the ALJ satisfied his burden at Step 5

by relying on the VE's testimony about the Addresser job, any error that the ALJ may have committed by relying on the testimony about the 'credit checker' job was harmless" (citing <u>Carmickle</u>, 533 F.3d at 1162)).  The VE testified that there were "more than 1,000" garment-sorter positions in the region and "more than 20,000 nationally." (AR 78.)  This appears to be a "significant number" of jobs sufficient to uphold the ALJ's decision.  <u>See</u> <u>Thomas</u>, 278 F.3d at 960 (1300 jobs in state sufficient); <u>Meanel</u>, 172 F.3d at 1115 (between 1000 and 1500 jobs in local area sufficient); <u>Moncada v. Chater</u>, 60 F.3d 521, 524 (9th Cir. 1995) (2300 jobs in county and 64,000 nationwide sufficient); <u>Barker v.</u> <u>Sec'y of Health & Human Servs.</u>, 882 F.2d 1474, 1479 (9th Cir. 1989) (1266 jobs regionally sufficient); <u>compare</u> <u>Beltran v.</u> <u>Astrue</u>, 676 F.3d 1203, 1207 (9th Cir. 2012) (135 jobs regionally and 1680 jobs nationally insufficient, but noting that "[w]e need not decide what the floor for a 'significant number' of jobs is in order to reach this conclusion").

Plaintiff is not entitled to remand on this ground.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED:  June 12, 2012

_____
JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[20]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."